**JEFFREY D. BARTOLINO**
**LAW OFFICES OF JEFFREY D. BARTOLINO**
**145 S. 6ᵗʰ Avenue**
**Tucson, Arizona 85701**
**(520) 884-8877**
**State Bar No: 003532**
**PCC3072**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATE OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No.: CR11-0794-RCC-CRP |
| ) | |
| vs. ) | SENTENCING MEMORANDUM |
| ) | |
| MELISSA SISNEROS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Introduction:

    The plea in this case provides for a sentence of probation. The only issue before

the court is whether, as a condition of this probation, Melissa should be subject to a

term of house arrest. Because of this stipulated sentence, I will limit my discussion to a

thumbnail sketch of the business in which she participated, and, more importantly her

role in this business. Additionally, I will enumerate the reasons why house arrest should

not be imposed as a condition of probation.

Business and Melissa's Participation:

    The PSR accurately reflects that Melissa's formal education ended in ninth

grade. The real estate investment business in which she was involved was run almost

exclusively by her husband, Dino. The sellers and purchasers of the properties have

given statements indicating that they dealt only with Dino. Because Dino was not a

signatory on a bank account during the early portion of the alleged scheme, Melissa

wrote all the checks necessary for the real estate transactions. Later, when Dino was added to the account, and obtained his own account, he wrote the checks.

Melissa was not privy to what other persons wrote on 1003 applications. In the purchases by her and Dino, she signed closing documents on the day that the transaction closed. The original purchase price on the contract for sale and the subsequent price between the ultimate purchaser and the seller were negotiated solely by Dino. Most, if not all of the "documents" outside of 1003, submitted to the lender came from Dino.

Her actions were transparent. When purchasing cashier's checks to be used for down payments, she wrote on the check its purpose, "down payment," and identified "the property." The agreement between the initial purchaser, the ultimate purchaser, and the seller were placed in the title files. In one transaction, the title company, upon reviewing these agreement documents, treated the transaction as a double escrow, and executed a 1099 for Dino's profit as the seller.

The business scheme designed by Dino was not a cash back scheme. A cash back scheme involves an initial purchase contract with a seller, a subsequent transfer of the purchase contract to a "straw buyer," and an agreed upon sale price far above the fair market value. When the sale is completed the perpetrator takes back the additional cash generated by the inflated price. The lender never hears from the perpetrator or "straw buyer" after closing. The "scheme" cannot be committed without falsely inflated appraisals being submitted to the lenders.

In contrast to the scheme above, all of the houses listed in the indictment were sold at fair market value. There were no fraudulent appraisals. More importantly, Dino expended money and renovated these properties between the signing of the initial purchase agreement, and the close with the ultimate purchaser. In many cases the total money put in by Dino exceeded the amounts that were paid out to Dino at closing.

The "business plan" of Dino was to keep the loan afloat for a certain amount of years, let the house appreciate, and then sell, with all parties getting back their money. Dino would attempt to find a lease purchaser in order to make mortgage payments, or pay the mortgage payments himself, and if a default on the loan appeared imminent, transfer the property to him and attempt to negotiate a settlement. The overall "scheme" was for all parties to be completely reimbursed.

Assertions in Government's Objection:

The government asserts that Straight Rate never existed, never had employees, nor generated revenue. While Straight Rate did not have a model business structure, it did exist. It obtained a business license as Straight Rate Painting and Remodeling in 2002. It employed many persons, hired subcontractors, and secured partners in construction work on houses. It advertised its business in various publications, had business cards, and subcontractor agreements.

The government argues that Melissa did not operate the vacation rental business, even though it has, in its possession, documents verifying rental of these properties, and revenue generated from these rentals. Persons were hired for upkeep and house cleaning on these vacation rentals. The income generated was clearly legitimate.

House Arrest Should Not Be Imposed:

The PSR write does not recommend a term of house arrest be imposed. This position is well taken.

I have already documented Melissa's role in the alleged criminal conduct. More importantly, however, is her role as a mother, and worker, prior to, and after the time frame of 2003 to 2007. She dropped out of school in ninth grade after she became pregnant. She has worked all of her life, while raising a loving family. She obtained a cosmetology certificate in the 90's, and also worked at a Lutheran pre-school in

Tennessee. From 1998 to 2003 she worked as a property manager at several Tucson area complexes.

The last alleged criminal act occurred in 2007, almost ten years ago. Since then, she has been steadily employed, has continued to raise her family, and assumed custodial care of her granddaughter. She is presently working as a property manager for Realty group. Whatever restitution that is to be paid in the near future will be from her pocket.

Melissa has been on pre-trial supervision for nearly six years. She has abided by all her conditions and demands during this period. There was a slight "blip" that occurred this summer. Since no petition was filed, counsel did not contest the blood result. However, based upon two later false positives, counsel believes the first test was also erroneous.

House arrest is normally imposed when the accused poses a risk to the community or to herself, requiring a tighter reign on that person. Melissa does not pose a risk to either herself or to the community. She has proved this by being compliant with probation-like conditions for a term that exceeds the longest term of probation available

Additionally, the imposition of house arrest could jeopardize her present employment. This would create problems in her continued support of her family and granddaughter, while also eliminating restitution payments.

Based upon Melissa's past performance, there is no reason to believe she would violate her conditions. Should a problem arise in the future, amendment of conditions of probation could be addressed at that time.

DATED this 8th day of November 2016.

/s/ Jeffrey D. Bartolino

-4-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Copy of the foregoing
Delivered/Mailed this 8th
Day of November 2016, to:

United States Attorney's Office
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701